UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

D-14  KUTUB MESIWALA, M.D.,

Defendant.

Case No.  13-cr-20892

Hon. Paul D. Borman

## UNITED STATES' OPPOSITION TO
## DEFENDANT'S MOTION TO TRAVEL TO CANADA

The United States of America, through its undersigned counsel, opposes

defendant Kutub Mesiwala's Motion to Travel to Canada (R. 246).  For the reasons

stated in the accompanying Memorandum in Opposition to Defendant's Motion to

Travel to Canada, the defendant's motion should be denied.

Respectfully submitted,

BARBARA L. MCQUADE
*United States Attorney*

By:  */s Katharine A. Wagner*
Katharine A. Wagner
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
Washington, DC 20005
Phone:  (202) 341-8882
Email:  katharine.wagner@usdoj.gov

Dated: November 14, 2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

D-14  KUTUB MESIWALA, M.D.,

Defendant.

Case No.  13-cr-20892

Hon. Paul D. Borman

**MEMORANDUM IN SUPPORT OF UNITED STATES'
OPPOSITION TO DEFENDANT'S MOTION TO TRAVEL TO CANADA**

Defendant Kutub Mesiwala, M.D. ("Mesiwala") moves this Court for permission to travel to Canada on December 25–28, 2014.  (R. 246).  Because the defendant is a flight risk and the condition of release requiring the defendant to surrender any passport to Pretrial Services remains the least restrictive condition that will reasonably assure his appearance in court as required, the defendant's Motion must be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On September 25, 2014, a grand jury returned a Second Superseding Indictment charging defendant Mesiwala with one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and one count of conspiracy to pay or receive health care kickbacks, in violation of 18 U.S.C. § 371, for his role in conspiring to execute a health care benefit fraud scheme that fraudulently billed millions of dollars to the Medicare program.  (R. 196).  In the same Second Superseding Indictment, defendant Mesiwala was also charged with two counts of health care fraud, in violation of 18 U.S.C. §§ 1347 and 2, for billing Medicare for home visits that Mesiwala purportedly rendered while he was out of the country.

### A.     Mesiwala Admits to Receiving Kickbacks

Defendant Mesiwala admitted to federal agents that he received cash kickbacks in exchange for home health referrals to Amer Ehsan ("Ehsan"), who owned Advance Home Care Services LLC ("Advance") and sold patient information, including defendant Mesiwala's referrals, to other home health care agencies in the Detroit area.   *See* Interview of Kutub Mesiwala on September 5, 2014, attached hereto as Attachment A (hereinafter, "Mesiwala Interview"); Interview of Amer Ehsan on August 14, 2014, attached hereto as Attachment B. Advance and other home health agencies then used Mesiwala's home health

referrals to submit claims to Medicare for home health care services that were not medically necessary and, in some cases, not provided.  In total, between 2009 and 2013, Medicare paid Advance more than $770,000 for home health care services purportedly rendered to Medicare beneficiaries referred by Mesiwala.

Mesiwala further admitted to agents that he referred two types of Medicare beneficiaries to Ehsan in exchange for cash kickbacks: (1) his long-standing patients from his visiting physician practice; and (2) Medicare beneficiaries that Ehsan sent to Mesiwala for the express purpose of obtaining home health referrals. Mesiwala Interview, Attachment A.  Defendant Mesiwala admitted to receiving $200 per referral for patients referred to Ehsan from the first group (those he originated) and $50 per beneficiary referred to Ehsan from the second group (those Ehsan originated).  *Id.*

### B. Mesiwala Admits to Billing Physician Services for Beneficiaries Sent to Him Through the Kickback Arrangement

Medicare claims further data reveals that defendant Mesiwala also billed Medicare for home visits and other visiting physician services purportedly rendered to the Medicare beneficiaries Ehsan sent to him and for home health supervision services supposedly rendered to the Medicare beneficiaries he referred to Ehsan in exchange for cash kickbacks.  The kickback exchange that Mesiwala

3

described is unfortunately a common one in health care fraud cases in Detroit: doctors are incentivized to refer non-homebound patients both through direct (cash) kickbacks and the opportunity to bill the patients sent to them by the fraudulent home health care companies.

### C.     Mesiwala Bills For Services When He Is Out Of The Country

Finally, as outlined in Counts 7 and 8 of the Second Superseding Indictment, defendant Mesiwala billed Medicare for visiting physician services that he purportedly rendered while travel records indicate that he was out of the country. (R. 196 ¶¶ 80–85.)   Mesiwala billed Medicare directly under his own provider number and indirectly through Professional Consultants, Inc., a Michigan company owned by his wife.   Professional Consultants billed Medicare solely for Mesiwala's services, and all income goes to a bank account controlled by his wife. In total, Medicare claims data reveals that defendant Mesiwala billed Medicare for approximately $87,940 for services he purportedly rendered in Michigan while he was not in the United States.

### D.     Mesiwala Lies to Pretrial Services About His Income and Assets

Prior to defendant Mesiwala's arraignment on September 20, 2012, he was interviewed by Pretrial Services.   According to Pretrial Services, defendant Mesiwala reported that he had an average monthly income of $7,000 and the

following assets: (1) $5,000 in a checking account; (2) his residence in Bloomfield Hills, Michigan; (3) a 2005 Nissan automobile; and (4) real property in Florida valued at approximately $2,000.  However, bank records indicate that between August 2013 and July 2014, an account held in Mesiwala's name received an average of approximately $11,870 in direct deposits from Medicare per month; and, during the same time period, an account held in the name of Professional Consultants received an average of approximately $14,150 in direct deposits per month from Medicare for services purportedly provided by defendant Mesiwala. In total, Medicare paid these two accounts more than $300,000 in the year leading up to the defendant's arrest (August 2013 through July 2014).

### E.    Mesiwala's Conditions of Release

Magistrate Judge R. Steven Whalen ordered conditions of release placed on the defendant, including the requirement that he surrender any passport or enhanced driver's license to Pretrial Services within 24 hours.  (R. 216.)  The defendant now moves this Court to modify his conditions of release to allow him access to a passport so that he may travel to Canada in December 2014 to stay with family and attend his son's wedding.  (R. 246.)

## II.    LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court should seek to apply the least restrictive condition or combination of conditions that will "reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(b).  The Court considers the following factors in making its determination as to whether there are conditions of release that will reasonably assure the appearance of the defendant as required: (1) the nature and circumstances of the offenses charged, including whether they are crimes of violence; (2) the weight of the evidence against the accused; (3) the history and characteristics of the individual, such as his or her character, physical and mental condition, family and community ties, criminal history and record concerning appearances in court when required; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

## III.    Factors Regarding Risk of Flight

Defendant Mesiwala's Motion to Travel to Canada should be denied because the defendant continues to present a risk of flight given his substantial resources, family connections overseas, and the weight of the evidence in this case.  Granting

defendant's Motion and returning the defendant's passport would strip away any reasonable assurance that the defendant will appear at trial as required.

Defendant's expressed basis for requesting that the Court allow him to travel to Canada is his desire to attend his son's wedding.  Although the defendant would miss the official ceremony, denying the defendant's request to leave the United States does not preclude him from celebrating the occasion with his son and new daughter-in-law in Michigan.

The defendant has not articulated any change in circumstances since the time his conditions of release were put in place that should persuade the Court to remove the requirement that she surrender any passport to Pretrial Services.  The condition of release requiring him to surrender any passport to Pretrial Services remains the least restrictive condition that will reasonably assure his appearance in court as required.

As demonstrated below, the factors regarding risk of flight weigh heavily against permitting defendant Mesiwala to travel to India because he (1) has close ties to other countries; (2) has substantial financial resources at his disposal, most of them undisclosed to Pretrial Services; (3) has a prior criminal history both of distributing illegal prescription drugs and also of money laundering; and (4) faces strong evidence of his guilt, including his own admissions.

## A.   Resources and Family Contacts Outside of the United States

Defendant Mesiwala has substantial family contacts available to him outside of the United States.  Defendant Mesiwala's own motion establishes (1) that he has relatives in Toronto, Canada; and (2) he maintains connections in his country of origin, India.   (R. 246 ¶¶ 5, 8.)   Travel records also indicate that defendant Mesiwala regularly travels abroad, mostly to India, including on the following dates:

| Departure Date | Transit/Destination | Return Date |
| --- | --- | --- |
| 9/3/2008 | Frankfurt | 9/17/2008 |
| 2/21/2009 | Mumbai | 3/16/2009 |
| 4/11/2009 | Amsterdam | 4/26/2009 |
| 2/16/2010 | Amsterdam | 2/25/2010 |
| 3/23/2010 | Amsterdam | 4/8/2010 |
| 4/29/2011 | Turkey | 5/8/2011 |
| 10/23/2011 | New Delhi | 11/8/2011 |
| 2/20/2012 | Turkey | 3/7/2012 |
| 8/22/2012 | Heathrow | 9/9/2012 |
| 3/17/2013 | Dubai | 4/9/2013 |
| 11/19/2013 | Beijing | 11/26/2013 |
| 2/15/2014 | Munich | 3/2/2014 |

The defendant also made trips to Canada on at least the following days: (1) 12/18/2006; (2) 6/15/2007; (3) 6/7/2008; (4) 12/29/2008; (5) 1/2/2011; and (6) 8/27/2014.

Additionally, if the defendant is convicted of the charged crimes, in addition to facing a significant prison sentence, the defendant will also face an exclusion from treating Medicare beneficiaries and causing the submission of claims to the Medicare program.  As such, the defendant may view his prospects for finding future employment as a physician to be better outside of the United States.

Finally, the defendant's Motion raises the argument that he would not abandon his children who are residing in this country by fleeing.  (R. 246 at 3). The more logical possibility, since his children appear not to live locally in the Detroit area and there is no restraint on the children's ability to leave the United States, is that defendant Mesiwala would be able to maintain his ties with his family while abroad.

### B.   Undisclosed Financial Resources

In addition to his ties to Canada and India, bank records and Medicare claims data reveal that defendant Mesiwala has substantial income—which he did not disclose to Pretrial Services—at his disposal.  On October 2, 2014, defendant Mesiwala reported to Pretrial Services (and, as a result, to the Court) that his monthly income was approximately $7,000.  Bank records indicate otherwise.  In fact, bank records and Medicare claims data reveal that Medicare paid the defendant approximately $25,600 per month between August 2013 and July 2014

9

alone.  Mesiwala received these payments both directly through his individual Medicare provider identification number ("PIN") and through his wife's company, Professional Consultants.

Between August 2013 and July 2014, Medicare made approximately the following direct deposits into accounts held by Mesiwala and his wife's company, Professional Consultants:

| Date | Mesiwala | Professional Consultants | Total Monthly Medicare Income |
|---|---|---|---|
| August 2013 | $7,809.52 | $19,563.18 | $27,372.70 |
| September 2013 | $7,291.72 | $19,354.31 | $26,646.03 |
| October 2013 | $8,766.16 | $19,835.04 | $28,601.20 |
| November 2013 | $16,064.35 | $5,583.08 | $21,647.43 |
| December 2013 | $16,526.50 | $6,588.85 | $23,115.35 |
| January 2014 | $24,996.09 | $22,245.50 | $47,241.59 |
| February 2014 | $3,306.45 | $11,952.89 | $15,259.34 |
| March 2014 | $10,607.42 | $11,208.35 | $21,815.77 |
| April 2014 | $1,542.77 | $15,920.46 | $17,463.23 |
| May 2014 | $10,685.72 | $11,333.99 | $22,019.71 |
| June 2014 | $9,655.47 | $10,650.63 | $20,306.10 |
| July 2014 | $13,927.83 | $15,562.31 | $29,490.14 |
| **Total:** | **$131,180.00** | **$169,798.59** | **$300,978.59** |

With the addition of between $1,560 and $1,597 per month from the Social Security Administration, defendant Mesiwala received approximately $27,613.23 per month in income in the year before his arrest.  Over the same time period, Mesiwala and Professional Consultants received a total of approximately

$300,978.59, not including additional payments from Blue Cross Blue Shield and other deposits.

In fact, defendant Mesiwala's medical practice—primarily funded by Medicare reimbursements—was a lucrative one throughout the period of the charged health care fraud conspiracy. For services purportedly rendered during the period of the conspiracy (February 2009 through December 2013), defendant Mesiwala was paid $535,439.47 and Professional Consultants was paid $948,966.25 by Medicare for services purportedly rendered by the defendant. The current location of those funds is unknown and, as such, could support defendant Mesiwala should he decide not to return to the United States following any trip to Canada or elsewhere.

### C. Prior Criminal History

The importance of the assets available to defendant Mesiwala becomes even more important in light of his prior criminal history. In 1990, Mesiwala was convicted of money laundering, in violation of 18 U.S.C. § 1956, and an additional charge in violation of Title 21 related to the illegal distribution of prescription drugs.[1] He served time in a federal prison for those convictions and also lost his

---

[1] The government has requested defendant's earlier case file from off-site storage, but that request remains pending. The government will update the Court

license to practice medicine in the State of Michigan until the mid-2000s. Consequently, defendant Mesiwala is aware of the ramifications of a conviction in the instant case, that is, a return to prison and the loss of his livelihood.  As this criminal history demonstrates, the defendant has not only the resources to flee, but he has experience in laundering the proceeds of his criminal activity, both of which weigh heavily against permitting his travel to Canada.

### D. Strength of the Evidence

The evidence against defendant Mesiwala is strong.  First, defendant Mesiwala admitted to receiving kickbacks in exchange for referring Medicare beneficiaries to Ehsan and Advance.  (*See* Mesiwala Interview, Attachment A.) The defendant also appears to admit to receiving kickbacks from Ehsan in exchange for referrals in his Motion for Reconsideration filed on November 10, 2014.  (R. 250 at 5, 9.)  Although this motion mischaracterizes his involvement as "simply a kick back arrangement," such an arrangement is a violation of law and tantamount to an admission to Count 2 of the Second Superseding Indictment. (*See id.* at 9; R. 196 ¶¶ 59–75.)  Count 2 carries a five-year statutory maximum, 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b, and the loss amount associated with

---

on the defendant's criminal history once the prior case file has arrived from offsite storage.

defendant Mesiwala's referrals to Advance alone—not including the referrals to other home health agencies associated with Ehsan—is more than $770,000.

Second, the evidence against defendant Mesiwala as to Counts 7 and 8 (health care fraud) is likewise formidable.  According to Medicare claims data, between 2009 and 2013, Mesiwala billed Medicare approximately $87,940 for services that he purportedly rendered in Michigan between 2010 and 2013 when travel records indicate that he was out of the country.  As alleged in Counts 7 and 8, the substantive health care fraud counts are but two examples of this more widespread form of fraudulent billing by the defendant over five years.  (*See* R. 196 ¶¶ 84–85.)

Finally, Count 1 of the Second Superseding Indictment charges defendant Mesiwala with health care fraud conspiracy.  Defendant Mesiwala admitted to federal agents that at least some of the home health referrals that he sold to Ehsan were for Medicare beneficiaries who requested the referrals but did not need them. Mesiwala Interview, Attachment A.  Mesiwala further told the agents that he referred them because he feared that the beneficiaries would find another visiting doctor.  *Id.*  Additionally, agents interviewed five beneficiaries who were referred home health services by the defendant, and all five stated that they were able to leave the home and get around by bus or by car during the time that they were

referred for home health services by Mesiwala.  One of those beneficiaries was co-defendant James Zadorski, who asked the defendant for a home health referral and was actively traversing the Detroit area as a patient recruiter at the time.

In addition to referring Medicare beneficiaries to Ehsan for home health services that he knew were unnecessary, the defendant also billed Medicare for visiting physician services related to the home health referrals.  (*See* R. 196 ¶¶ 48, 49, 57.)  Medicare claims data reveals that he billed Medicare for home health care supervision services purportedly rendered to the Medicare beneficiaries who he referred to Ehsan in exchange for kickbacks.  Mesiwala also billed Medicare for home visits for Medicare beneficiaries who Ehsan referred to him for the sole purpose of obtaining home health care referrals.  The ability to bill Medicare Part B for physician services constitutes a form of inducement or kickback prohibited by 42 U.S.C. § 1320a-7b, and Medicare does not pay claims for services procured through kickbacks.

## IV.    Conclusion

For the foregoing reasons, the United States respectfully requests that the Court deny the defendant's Motion to Travel to Canada.

Respectfully submitted,

BARBARA L. MCQUADE
*United States Attorney*

By:    */s Katharine A. Wagner*
Katharine A. Wagner
Trial Attorney
Patrick J. Hurford
Assistant United States Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave, NW
Washington, DC 20005
Cell:  (202) 341-8882
Email: katharine.wagner@usdoj.gov

Dated: November 14, 2014

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2014, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to counsel for defendant Kutub Mesiwala, M.D.

*/s Katharine A. Wagner*
Katharine A. Wagner
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave, NW
Washington, DC 20005
Cell:  (202) 341-8882
Email: katharine.wagner@usdoj.gov